{¶ 28} I respectfully dissent from the majority view finding merit in appellant's first assignment of error. I would affirm the decision of the trial court as to that assignment of error and affirm on the remaining assignments of error not addressed by the majority.
 {¶ 29} The majority finds the circumstances involving Sgt. Franczak's downloading of the LEADS photograph "suggestive," and thus finds the identification of Bates unreliable. I disagree.
 {¶ 30} The majority properly notes that even a suggestive photograph does not impact the admissibility of a reliable identification. SeeMoody, supra, and Brown, supra. Here, I do not believe the photo was suggestive, nor do I believe it rendered the identification unreliable. This was simply a case of diligent police work that paid off in the end.
 {¶ 31} While one can argue that Sgt. Franczak should have immediately arrested Bates if he "knew it was him" when he turned up at the police station, this does not always happen in the course of a police investigation. Bates purportedly turned up to "explain" his situation. Sgt. Franczak, to his credit, did not rush to judgment, but rather first ruled out the ancillary "suspect" suggested by Bates. Sgt. Franczak certainly was focused on Bates, which is evidenced by the fact that he read Bates his rights when Bates appeared at the station.
 {¶ 32} Sgt. Franczak's credibility should not be questioned simply because he showed some sophistication in answering the cell phone left in the auto, resulting in his learning the name "Maurice." Nor should he be questioned for showing initiative and talking to Tate to establish that Maurice had permission to use the vehicle at the time of the incident.
 {¶ 33} Sgt. Franczak testified he was able to look specifically at the driver's face from 25 to 35 feet away and had a clear, unobstructed view of Bates when he fled through the fence. This formed the underlying basis of his identification.
 {¶ 34} In this case, I find the majority's concern about Sgt. Franczak's prior knowledge of specific facts related to Maurice at the time of the downloading of the photograph unfounded. Officers, as trained and experienced professionals, are often aware of related facts that may or may not impact their judgment. This prior knowledge is subject to cross-examination and an assessment by the trial court as to reliability.[17]
 {¶ 35} In my view, the alternative procedure for a photo array suggested by the majority is inconsistent with the realities of modern police investigations. Creating an independent photo array by other officers is unduly burdensome. Further, it does not insure a less "suggestive" identification process, as claimed. Officers, who have limited time to investigate fresh cases, use investigative techniques that provide information, such as LEADS. The fact that a photograph can be downloaded, and often is, in many police investigations does not automatically imply a suggestive identification. This process is no different, or no more suggestive, than when an officer visually sees a suspect on a street corner several minutes or hours after an initial encounter, or when an officer, upon arriving at a police district after an encounter, happens to see a posted photograph and recognizes it as that of the suspect.
 {¶ 36} Since Sgt. Franczak had no way of knowing what image would be depicted in the photograph prior to downloading, it is unreasonable to require a photo array to avoid a perception that a photo is potentially suggestive. The trial court's analysis on reliability and the determination of credibility by the trier of fact, after rigid cross-examination, provide the best insurance against unreliable identifications.
[17] In this case, Sgt. Franczak's factual knowledge about Maurice might have explained a police focus on Maurice rather than on his twin, Mario, but Maurice's twin brother, Mario, was never a suspect. Thus, ancillary facts related to Maurice cannot be said to have "poisoned" the underlying photo identification that was based on the initial encounter.